# United States Court of Appeals
## For the First Circuit

No. 09-2415

UNITED STATES OF AMERICA,

Appellee,

v.

ÁNGEL CAMACHO, A/K/A ANÍBAL CASTRO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Boudin, and Lipez,
Circuit Judges.

William W. Fick, with whom Federal Public Defender Office, was on brief for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief for appellee.

November 23, 2011

**TORRUELLA**, **Circuit Judge**. Appellant Ángel Camacho was charged with one count of unlawful possession of a firearm and ammunition despite having a prior felony conviction, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922 (k). Camacho moved to suppress the firearm and ammunition, arguing that they were obtained through an illegal search and seizure in violation of the Fourth Amendment. The trial judge denied that motion. United States v. Camacho, 608 F. Supp. 2d 178, 185 (D. Mass. 2009). Camacho then entered conditional guilty pleas on both counts, reserving his right to challenge the trial judge's suppression ruling on appeal. He now exercises that right. We agree with Camacho that his motion to suppress should have been granted. Accordingly, we reverse.

## I. Background and Procedural History

We summarize the facts as found by the district court in its denial of Camacho's motion to suppress. See Camacho, 608 F. Supp. 2d at 180-81. Those findings of fact are consistent with the record and are not clearly erroneous. See United States v. Dancy, 640 F.3d 455, 458 (1st Cir. 2011).

## A. A Rumble in New Bedford

At 5:37 p.m., on January 11, 2008, a series of 911 calls reported a fight in progress in the North End neighborhood of New Bedford, Massachusetts, at the intersection of Nye and Brook

Streets. One of the callers identified "most" of the combatants as members of the Latin Kings, a prominent national street gang. Sargeant Scott Carola of the New Bedford Police Department's Gang Unit was the first officer to arrive at the scene. Within a minute, two other Gang Unit members -- Officers Adelino Sousa and David Conceicao -- also arrived, driving an unmarked, police-issued Ford Crown Victoria[1] and wearing jackets adorned with the image of a police badge and the words "New Bedford Police" on the front and the words "Gang Unit" on the back.

Sargeant Carola saw twelve to fifteen people scattering from what appeared to have been a street brawl; Officer Sousa recognized several of them as affiliates of the Latin Kings. Sgt. Carola also noticed two men he did not recognize walking down the street; he directed Officers Sousa and Conceicao to intercept and question the two men. Those two men were Camacho and Louis Osario-Meléndez.

## B.  The Confrontation

Still driving in the Crown Victoria, Officers Sousa and Conceicao followed the two men as they walked around the corner, then pulled ahead of them into a driveway, partially blocking their

---

[1]  The district court noted that the Crown Victoria was "easily recognizable as a police vehicle." Camacho, 608 F.3d at 180. Though the car was not painted with police markings, it did have police lights. And we have previously noted that the Crown Victoria is "a model widely associated with police departments." United States v. Wright, 582 F.3d 199, 203 (1st Cir. 2009).

path.  Officer Sousa stepped out of the car and approached Camacho, while Officer Conceicao ordered Osario-Meléndez to put his hands on the hood of the car.  Sousa and Conceicao did not recognize the two men, and neither officer had reason to believe that either Camacho or Osario-Meléndez was a member of the Latin Kings.

Officer Sousa did notice, however, that Camacho's clothes were wet and his breathing was labored.  Sousa asked Camacho where he was coming from, and Camacho replied, "Nye Street."  Camacho said that he had seen the Nye Street fight, but denied having been involved in it.  Camacho's speech was normal, and he was wearing a hooded sweatshirt, which Officer Sousa did not consider unusual.  During their colloquy, Camacho held his hands in the front pockets of the sweatshirt.  When Officer Sousa told him to remove his hands, Camacho did so slowly and deliberately, clasping his hands in front of his waistband, seeming to protect his midriff.

Finding Camacho's studied movement and hand placement unusual, Officer Sousa tapped Camacho's waist with his open palm.  Sousa immediately felt the butt of a gun, and yelled, "Gun!"  Camacho then "automatically" shoved Sousa, and Officer Conceicao drew his service revolver and aimed it at Osario-Meléndez.  Sousa and Camacho began struggling, which Officer Conceicao ended "within thirty seconds" by hitting Camacho over the head with his flashlight, knocking him to the ground.  With Camacho now subdued, Officer Sousa seized a .40 caliber Glock revolver -- with a live

round in the chamber and eight rounds in the magazine -- from beneath Camacho's belt.

## C.  Legal Proceedings

### 1.  The Indictment and Camacho's Motion to Suppress

A federal grand jury charged Camacho with two counts: one count of unlawful possession of a firearm and ammunition by a prior felon, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k).  Challenging both counts, Camacho moved to suppress the firearm and ammunition, arguing that they were obtained through an illegal search and seizure.  The trial judge conducted an evidentiary hearing on the motion, at which Sgt. Carola, Officer Sousa, and Officer Conceicao testified.

### 2.  The District Court's Ruling on the Motion to Suppress

The trial judge denied Camacho's motion to suppress. Camacho, 608 F. Supp. 2d at 185.  As a preliminary matter, the judge ruled that Camacho was seized for Fourth Amendment purposes when Officer Sousa began questioning him, noting that Officer Conceicao ordered Osario-Meléndez to place his hands on the hood of officers' car while just a few feet away Officer Sousa was asking Camacho "questions that were accusatory in tone and content." Id. at 184.  The judge agreed with Camacho that the police officers lacked the reasonable suspicion necessary for a Terry stop, explaining that "[t]he most that can be said is that the two men

were observed in a high crime area walking away from the vicinity of a street fight that one caller reported as involving Latin Kings." Id. For the judge, this was not enough to raise a reasonable suspicion. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). Nonetheless, the judge concluded that suppression of the gun was "neither called for nor appropriate." Camacho, 608 F. Supp. 2d at 185. The trial judge found it material that "[t]he gun was seized only after Camacho shoved Sousa and only after the officers succeeded in wrestling Camacho to the ground and placing him under arrest." Id. Therefore, the judge reasoned, "[t]he acts of shoving Officer Sousa and resisting arrest were intervening crimes giving the officers independent grounds to arrest Camacho," id. (citing United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir. 1983) (en banc) (noting that resistance to even an unlawful arrest is a sufficient and independent ground for a second arrest for a new, distinct crime)), and the seizure of the gun was justified under the search incident to arrest exception to the Fourth Amendment. See United States v. Robinson, 414 U.S. 218, 236 (1973).

### 3. Sentence and Appeal

After his motion to suppress was denied, Camacho entered conditional guilty pleas on both counts, reserving his right to challenge the district court's suppression ruling on appeal. The district court accepted Camacho's pleas and sentenced him to the mandatory minimum sentence of 15 years of imprisonment on Count One (to be served concurrently with 5 years of imprisonment on Count Two), followed by 5 years of supervised release, and a monetary penalty of $200.

On appeal, Camacho challenges the district court's denial of his motion to suppress the firearm and ammunition. He also argues that the district court erred by sentencing him as an "armed career criminal" based on his two prior felony convictions in Massachusetts. We agree with Camacho regarding the search and seizure, and we reverse on that basis, making his sentencing arguments moot.

## II. Discussion

## A. Standard of Review

When reviewing a challenge to the district court's denial of a motion to suppress, "[w]e view the facts in the light most favorable to the district court's ruling" on the motion, United States v. Soares, 521 F.3d 117, 118 (1st Cir. 2008), and we review the district court's findings of fact and credibility determinations for clear error. Dancy, 640 F.3d at 460. "A clear

error exists only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made." United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996). Under this clear error standard for findings of fact, we "will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it." United States v. Méndez-de Jesús, 85 F.3d 1, 2 (1st Cir. 1996); see also United States v. Reynolds, 646 F.3d 63, 73 (1st Cir. 2011); United States v. Cruz-Jiménez, 894 F.2d 1, 7 (1st Cir. 1990) ("Where there are two competing interpretations of the evidence, the district court's choice of one of them cannot be clearly erroneous.").

However, we review de novo the district court's conclusions of law, including its application of the law to the facts, its probable cause and reasonable suspicion determinations, and the district court's ultimate legal decision to grant or deny the motion to suppress. See United States v. Crespo-Ríos, 645 F.3d 37, 41 (1st Cir. 2011); Reynolds, 646 F.3d at 73; Dancy, 640 F.3d at 460; United States v. Lawlor, 406 F.3d 37, 41 (1st Cir. 2005); Méndez-de Jesús, 85 F.3d at 2 ("Our review of a district court's decision to grant or deny a suppression motion is plenary."). The appellant bears the burden of showing a violation of his Fourth Amendment rights. United States v. Werra, 638 F.3d 326, 330 (1st Cir. 2011).

## B.  The Fourth Amendment and <u>Terry</u> Stops

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV; <u>see also</u> <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1, 9 (1968).  Warrantless searches are <u>per</u> <u>se</u> unreasonable under the Fourth Amendment, unless "one of a few specifically established and well-delineated exceptions" applies.  <u>Arizona</u> v. <u>Gant</u>, 556 U.S. 332, 129 S. Ct. 1710, 1716 (2009).  This prohibition on unreasonable searches and seizures[2] is enforced through the exclusionary rule, which excludes evidence seized in violation of the Fourth Amendment.  <u>See</u> <u>Terry</u>, 392 U.S. at 12 ("Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct.").  It is this exclusionary rule on which Camacho's motion to suppress relies.

The Government, for its part, opposes suppression by relying on one of the few "well-delineated exceptions" to the warrant requirement -- namely, the exception for a search incident to a lawful arrest.  <u>See</u> <u>Gant</u>, 129 S. Ct. at 1716.  The Government argues that "Camacho's acts of shoving Officer Sousa and resisting

---

[2]  To review basic terminology for purposes of the Fourth Amendment, "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." <u>Terry</u>, 392 U.S. at 16.  And "a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons"" qualifies as a "search." <u>Id.</u>  Thus, when police officers conduct a "stop and frisk," the stop amounts to a "seizure" and the frisk constitutes a "search" for purposes of the Fourth Amendment. <u>See</u> <u>id.</u> at 16-19.

arrest constituted intervening crimes that gave the officers independent grounds to arrest him and conduct a search incident to that arrest."

The protections of the Fourth Amendment apply not only to traditional arrests, but also to those brief investigatory stops generally known as Terry stops.  See United States v. Arvizu, 534 U.S. 266, 273 (2002); Terry, 392 U.S. 1; United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997).  Terry held that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.  Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

Terry, 392 U.S. at 30-31.

Accordingly, applying the principles of Terry and its progeny to this case, we address four questions. First, in view of the totality of the circumstances, did Camacho's initial encounter with Officer Sousa rise to the level of a seizure, triggering the protections of the Fourth Amendment?  See United States v. Ford,

-10-

548 F.3d 1, 4-5 (1st Cir. 2008).  Second, did the police officers have a reasonable suspicion that Camacho was engaged in criminal activity, thus making his initial detention a valid <u>Terry</u> stop?  <u>See</u> <u>Wright</u>, 582 F.3d at 205.  Third, was Officer Sousa legally justified under the Fourth Amendment in frisking Camacho?  <u>See</u> <u>United States</u> v. <u>McGregor</u>, 650 F.3d 813, 820 (1st Cir. 2011).  And finally, was the gun admissible under the search incident to arrest exception?

### 1.  Did Officer Sousa Seize Camacho?

A Fourth Amendment seizure occurs when a police officer "has in some way restrained the liberty of a citizen" through "physical force or show of authority."  <u>Terry</u>, 392 U.S. at 19 n.16; <u>see also</u> <u>Brendlin</u> v. <u>California</u>, 551 U.S. 249, 254 (2007); <u>United States</u> v. <u>Chaney</u>, 647 F.3d 401, 408 (1st Cir. 2011) ("Any detention of an individual by a police officer constitutes a seizure and, to be lawful, must be adequately justified under the Fourth Amendment.").  To determine whether an officer has restricted an individual's freedom of movement, courts determine the "coercive effect of the encounter" by asking whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  <u>Brendlin</u>, 551 U.S. at 255 (quoting <u>Florida</u> v. <u>Bostick</u>, 501 U.S. 429, 435-36 (1991)) (internal quotation marks omitted).

Applying this standard, we conclude that Camacho's initial detention constituted a seizure rather than a consensual encounter. This is not a case in which the officers "merely approach[ed] an individual on the street . . . by asking him if he [was] willing to answer some questions." See Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion); see also Young, 105 F.3d at 5-6 (finding only a "minimally intrusive" interaction that "d[id] not trigger the protections of the Fourth Amendment" when the police officers had pulled alongside the appellant, identified themselves as police officers, and asked "Got a minute?", to which the appellant replied, "Sure"). Rather, Officers Sousa and Conceicao intentionally blocked Camacho's path with their Crown Victoria; both officers were wearing jackets labeled "New Bedford Police" and "Gang Unit"; Officer Sousa stepped out of the car and confronted Camacho with "accusatory" questions; and Officer Conceicao ordered Osario-Meléndez to place his hands on the hood of the car. Under the totality of these circumstances, we agree with the district court that a reasonable person in Camacho's circumstances would not "feel free 'to disregard the police and go about his business.'" See Bostick, 501 U.S. at 434 (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)); cf. also Gentry v. Sevier, 597 F.3d 838, 845 (7th Cir. 2010) ("A reasonable person in [the appellant's] position, who saw a marked police car pull up and who was told by a police officer to keep his hands up, would

-12-

not believe that he was free to leave."). And Camacho submitted to Officer Sousa's show of authority by responding to his questions, at which point "his liberty ha[d] been restrained and he [was] seized under the Fourth Amendment." United States v. Dubose, 579 F.3d 117, 121 (1st Cir. 2009) (citing United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994)); see Hodari D., 499 U.S. at 626 (holding that when a seizure is based upon an officer's show of authority, no seizure occurs until the suspect yields to that authority and is thereby restrained in his liberty). Therefore, we conclude that Officer Sousa's initial questioning of Camacho constituted a seizure for purposes of the Fourth Amendment.

## 2. Was Stopping Camacho an Unreasonable Seizure?

Terry v. Ohio and its progeny provide an exception to the Fourth Amendment's warrant requirement, establishing that a police officer may briefly detain an individual for questioning if the officer "reasonably suspects that the person apprehended is committing or has committed a crime." Arizona v. Johnson, 555 U.S. 323, 323 (2009). Accordingly, we next ask whether Officers Sousa and Conceicao held a reasonable suspicion that Camacho was engaged in criminal activity.

The reasonable suspicion standard is an intermediate, indeterminate standard that requires more than a mere hunch but less than probable cause. United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). Somewhat more precisely, it demands "a

-13-

'particularized and objective basis' for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Thus, the suspicion must be both objectively reasonable and "grounded in specific and articulable facts." United States v. Hensley, 469 U.S. 221, 229 (1985). We evaluate reasonable suspicion based on "the totality of the circumstances." United States v. Jones, 432 F.3d 34, 40 (1st Cir. 2005).

Under the totality of these circumstances, we agree with the district court that the initial stop of Camacho "cannot be justified under the principles of Terry." Camacho, 608 F. Supp. 2d at 184. The police officers lacked an objectively reasonable, particularized basis for suspecting Camacho of criminal activity. See Ornelas, 517 U.S. at 696. None of the police officers at the scene recognized Camacho or Osario-Meléndez or had reason to believe that they were affiliated with the Latin Kings. Camacho, 608 F. Supp. 2d at 184. No one had identified Camacho or Osario-Meléndez, or men fitting their descriptions, as combatants in the brawl. Id. "The men were walking normally on a residential sidewalk and displayed no apprehension or nervousness when the officers approached," and Camacho's responses to Sousa's questions "were direct and non-evasive." Id. As for "specific and articulable facts" that could have formed the basis for an officer's reasonable suspicion, see Hensley, 469 U.S. at 229,

-14-

"[t]he most that can be said is that the two men were observed in a high crime area walking away from the vicinity of a street fight that one caller reported as involving Latin Kings." Camacho, 608 F. Supp. 2d at 184.[3]  Under these circumstances, the facts fall

---

[3]  The dissent's depiction of the facts in this regard strays from the district court's findings and the record before us on appeal. An appellate court is not free to disregard findings of fact by a district court without meeting the high standards required of a reviewing court, which in the present appeal the dissent neither explains nor meets. Cruz-Jiménez, 894 F.3d at 7 (noting that this court has opined on numerous occasions that "the findings of a district court made during a suppression hearing are binding on appeal unless clearly erroneous"); see also Young, 105 F.3d at 5 ("Deference to the district court's findings of fact reflects our awareness that the trial judge, who hears the testimony, observes the witnesses' demeanor and evaluates the facts first hand, sits in the best position to determine what actually happened."); cf. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123 (1969) (indicating, in the context of Fed. R. Civ. P. 52(a), that "[t]he authority of an appellate court, when reviewing the findings of a judge as well as those of a jury [under the clearly erroneous standard], is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence").  Contrary to the record or the findings of the district court, the dissent implicates Camacho and his companion in the reported street fight by characterizing them as two in a swarm of fleeing, known gang members.  There is no such evidence in the record. It also relies on an argument that the government affirmatively stated it was not making on appeal; that is, a challenge to the district court's determinations regarding reasonable suspicion.

The dissent points to Illinois v. Wardlow, 528 U.S. 119 (2000), in support of its contention that the stop in this case was valid. In Wardlow, a 5-4 decision, the Supreme Court held that the Terry stop was valid because, prior to the stop, the officers were justified in suspecting that Wardlow was involved in criminal activity.  Aside from his presence in an area of heavy narcotics trafficking, Wardlow had fled upon seeing police officers approach the area.  The Court noted that "[h]eadlong flight--wherever it occurs--is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Wardlow, 528 U.S. at 124.  This fact, coupled with the officers'

-15-

short of an objectively reasonable, particularized basis for suspecting Camacho of criminal activity. See Ornelas, 517 U.S. at 696. Therefore, as determined by the district court, Officer Sousa's initial questioning of Camacho was not a valid Terry stop, but was instead an unreasonable seizure in violation of the Fourth Amendment.

### 3. Was Frisking Camacho an Unreasonable Search?

Having already found the stopping and questioning of Camacho unconstitutional, we now turn to the second Fourth Amendment intrusion, the pat frisk. See United States v. Gilliard, 847 F.2d 21, 25 (1st Cir. 1988). As a preliminary matter, we note that Sousa's "tap" of Camacho's waist with his open palm was a frisk that constitutes a search subject to the protections of the Fourth Amendment. See, e.g., Terry, 392 U.S. 1, 19 ("In this case there can be no question, then, that Officer McFadden 'seized' petitioner and subjected him to a 'search' when he took hold of him and patted down the outer surfaces of his clothing."); see also United States v. Davis, 202 F.3d 1060, 1061 (8th Cir. 2000) ("The

---

understanding that they were converging on an area known for heavy narcotics trafficking, supported a finding of reasonable suspicion. But see id., 528 U.S. at 136-139 (Stevens, J., concurring in part and dissenting in part) (approving majority's rejection of a per se rule in favor of the totality-of-the-circumstances test, but noting that "even in a high crime neighborhood unprovoked flight does not invariably lead to reasonable suspicion"). In this case, what the record shows, and the district court found was two persons "walking normally on a residential sidewalk" and down the street, although others were scattering about. Thus, the facts in this case clearly fall outside of the holding in Wardlow.

-16-

[Terry] Court concluded that a protective frisk or pat-down search, however brief, is both a search and a seizure for Fourth Amendment purposes."). After a valid Terry stop, a police officer may conduct a protective frisk or pat-down search if "the officer is justified in believing that the person is armed and dangerous to the officer or others." United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004) (quoting United States v. Schiavo, 29 F.3d 6, 8 (1st Cir. 1994)) (internal quotation marks omitted). Therefore, in evaluating whether Sousa's tap of Camacho's waist was an unreasonable search in violation of the Fourth Amendment, we are confronted by two issues. First, as a matter of law, is it possible for a protective frisk to be valid under the Fourth Amendment when it immediately follows -- and directly results from -- an invalid Terry stop, in the absence of any intervening crimes?[4] Second, at the time of the frisk, was Officer Sousa

---

[4] In recent dicta, the Supreme Court has seemingly answered this question in the negative. See Arizona v. Johnson, 555 U.S. 323, 129 S. Ct. 781, 784 (2009) (noting that under Terry, a "stop and frisk" is only "constitutionally permissible if two conditions are met" -- "[f]irst, the investigatory stop must be lawful," and "[s]econd, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous"). See also Terry, 392 U.S. at 32-33 (Harlan, J., concurring) ("[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop. . . I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime.").

justified in believing that Camacho was armed and dangerous to the officers or others?[5]

Under these facts, we need not address the legality of the frisk itself. We conclude that regardless of the legality of the frisk, the discovery of the gun was so tainted by the illegal stop that it should have been suppressed as "fruit of the poisonous tree." See Werra, 638 F.3d at 341 (noting that the reasonableness of a protective frisk does not determine the suppression issue generated by an earlier Fourth Amendment violation).

Evidence obtained during a search may be tainted by the illegality of an earlier Fourth Amendment violation, so as to render such evidence inadmissable as "fruit of the poisonous tree." See United States v. D'Andrea, 648 U.S. 1, 6 (2011) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)) (internal quotation marks omitted); see also Werra, 638 F.3d at 341. "[T]he exclusionary rule reaches not only primary evidence obtained as a

---

[5] The Government does not argue -- either in its brief or at oral argument -- that Officer Sousa was justified in believing that Camacho was armed and dangerous. Nor does the Government argue that a lawful frisk may immediately follow an illegal seizure. Indeed, the Government maintains that we "need not decide this issue," because "it was not necessary to the district court's ultimate conclusion." Rather than argue that the initial stop or the subsequent frisk were lawful, the Government relies entirely on one argument that it considers dispositive -- that "Camacho's acts of shoving Officer Sousa and resisting arrest constitute intervening crimes . . . that removed any possible 'taint' from the initial encounter with the officers, and provided probable cause to arrest Camacho for his new crimes and conduct a search incident to that lawful arrest."

direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804 (1984) (citation omitted) (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)). This rule equally extends to both the direct and the indirect products of unlawful searches and seizures. See Wong Sun, 371 U.S. at 484. "[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." New York v. Harris, 495 U.S. 14, 19 (1990). Suppression is not appropriate, however, if "the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" Segura, 468 U.S. at 805 (quoting Nardone, 308 U.S. at 341).

Determining the consequences of unlawful police conduct for seized evidence requires looking at both causation and attenuation. The Supreme Court has declined to adopt a simple "but for" test that would mandate suppression of any evidence that "came to light through a chain of causation that began with an illegal arrest" or another Fourth Amendment violation. United States v. Leon, 468 U.S. 897, 910-11 (1984); see also Hudson v. Michigan, 547 U.S. 586, 592 (2006) ("[B]ut-for causality is only a necessary, not a sufficient, condition for suppression."). A strict but-for rule would prove nearly limitless. "Rather, the more apt question in

such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Wong Sun, 371 U.S. at 488 (quoting J. Maguire, Evidence of Guilt 221 (1959). When determining attenuation, "temporal proximity [], the presence of intervening circumstances, and, particularly the purpose and flagrancy of the official misconduct are all relevant." Brown, 422 U.S. at 603-604.

Here, Officers Sousa and Conceicao were responding to 911 calls that described "at most a misdemeanor assault and battery or disturbance of the peace" that "was not terribly serious." Camacho, 608 F. Supp. 2d at 184. The participants had already dispersed, so the police interest in investigating suspected participants in the misdemeanor brawl was minimal. Nonetheless, the officers pursued -- without reasonable suspicion -- two men who were merely "walking normally on a residential sidewalk." Yet the officers accosted the two men with a substantial show of authority, including: cutting off their path with an unmarked police car, ordering Osario-Meléndez to put his hands on the hood, asking Camacho "accusatory" questions, and ordering Camacho to take his hands out of his pockets. Up until at least that point, the officers' conduct amounted to a flagrant violation of the core of Camacho's Fourth Amendment right against unreasonable seizures.

-20-

Cf. Gentry, 597 F.3d at 845-46 (noting that the defendant "himself did not give the officers a reason to suspect that he had been engaged in any wrongdoing," and that "it should have been apparent to the officers that they had no basis to execute a Terry stop when they first observed" him).

Without cause, Officer Sousa reached out toward Camacho, felt the gun, and yelled "Gun!". The only intervening action by Camacho between the illegal stop and the frisk was removing his hands from his pockets at Officer Sousa's direction. After Officer Sousa's "tap," Camacho immediately responded by shoving him. A brief struggle ensued, after which Camacho was arrested and the gun was seized. The time elapsed between the illegal stop and the discovery and seizure of the gun was minimal. The officers' encounter with Camacho and the discovery of the gun "were both results of the officers' unconstitutional conduct." Werra, 638 F.3d at 341. Discovery of the gun flowed directly from the original unlawful seizure of Camacho and was not "so attenuated as to dissipate the taint" of the initial unlawful stop. See Nardone, 308 U.S. at 341. Under these facts, we conclude that the gun was fruit poisoned by the unlawful seizure and, accordingly, should have been suppressed. See Werra, 638 F.3d at 341.

**4. Is the Gun Admissible Pursuant to the Search Incident to Arrest Doctrine?**

The Government's sole argument against suppression tracks the district court's reasoning that Camacho's actions immediately

-21-

following the stop and frisk -- shoving Officer Sousa and resisting arrest -- "were intervening crimes giving the officers independent grounds to arrest Camacho." Camacho, 608 F. Supp. 2d at 185. Therefore, the argument goes, the seizure of the gun was justified under the search incident to arrest exception to the Fourth Amendment, and the gun was admissible on that basis alone, notwithstanding the illegality of the initial stop. Id. We disagree.

A search incident to a lawful arrest is another traditional exception to the Fourth Amendment's warrant requirement. United States v. Robinson, 414 U.S. 218, 224 (1973). Some courts have held that a defendant's resistance to even an invalid Terry stop or arrest can be independent grounds for a new, independent arrest, and that evidence discovered in a search incident to that lawful arrest is admissible. See, e.g., United States v. Dawdy, 46 F.3d 1427, 1430-31 (8th Cir. 1995) (citing cases from the Fifth, Ninth, Tenth, and Eleventh Circuits and holding that "a defendant's response to even an invalid arrest or Terry stop may constitute independent grounds for arrest," and "the evidence discovered in the subsequent searches of [the defendant's] person and his automobile is admissible"); see also United States v. King, 724 F.2d 253, 255-56 (1st Cir. 1984) (assuming some illegality in the police conduct, but denying suppression of evidence against a passenger in a car when: the driver of the car

-22-

committed an intervening crime of shooting at the officers; "the shooting was an independent intervening act which purged the taint of the prior illegality"; and the passenger's gun was discovered and seized after the shooting).  We agree that Camacho's actions of shoving Officer Sousa and resisting arrest provided grounds for his arrest and a search incident to that arrest.  But the validity of that search does not determine the suppression issue generated by the original unlawful seizure of Camacho.  See Werra, 638 F.3d at 341.

The gun at issue here was not discovered in a search subsequent to or incident to Camacho's arrest.  While the district court correctly noted that "[t]he gun was seized only after Camacho shoved Sousa and only after the officers succeeded in wrestling Camacho to the ground and placing him under arrest," the district court failed to account for the fact that Officer Sousa conducted the frisk -- the search that first discovered the gun -- before Camacho shoved him and before Camacho was arrested.  See Camacho, 608 F. Supp. 2d at 185.  The gun was not discovered by a search incident to his arrest, but rather by the frisk that preceded Camacho's subsequent actions of shoving Officer Sousa and resisting arrest.

The temporal relationship between the discovery of the weapon and the unlawful acts distinguishes this case from King, which the government cites as support.  In King, we assumed initial

-23-

unlawful police conduct but denied suppression of a seized weapon against the passenger in a car because the driver of the car committed the intervening crime of shooting at the police officers before the officers discovered the passenger's weapon. "At the moment the shot was fired, [the officer] had all the probable cause that was needed to search King." King, 724 F.2d at 256 ("[T]he shooting was an independent intervening act which purged the taint of the prior illegality."). In this case, Officer Sousa discovered the gun in a search conducted prior to Camacho committing any unlawful acts. Camacho's "intervening" crimes were not, in fact, intervening and thus could not purge the taint of the prior illegal stop.

### III. Conclusion

We conclude that the district court erred in denying Camacho's motion to suppress the firearm and ammunition. Accordingly, the judgment of the district court is reversed.

**Reversed**.

**(Dissenting opinion follows)**

**BOUDIN**, <u>Circuit Judge</u>, **dissenting**.  It is settled law that the police may not, without more, detain a suspect merely because he is present in a neighborhood where violent crime or drug dealing is common.  <u>Illinois</u> v. <u>Wardlow</u>, 528 U.S. 119 (2000).  So, too, "mere presence" at the scene of a crime is not the same as guilt.  <u>United States</u> v. <u>Llinas</u>, 373 F.3d 26, 32 (1st Cir. 2004).  But the devil is in the details, and the details here confirm that this is not a simple presence case and the police acted reasonably.

In January 2008, police were alerted by "911" calls that a street fight was in progress in a rough neighborhood of New Bedford, Massachusetts.  One call identified many of the participants as members of the Latin Kings, a well known and dangerous street gang.  <u>See</u> <u>United States</u> v. <u>Lara</u>, 181 F.3d 183 (1st Cir. 1999).  Officers of the New Bedford Police Gang Unit responded only to discover people scattering from the scene of the brawl--some of whom were recognized by officers as members of the gang.

Seeing two men he did not recognize leaving the scene, Sergeant Scott Carola directed Officers Adelino Sousa and David Conceicao to stop the two men.  The two officers drove around the corner, pulled their police car into a driveway in front of the two men, and exited the car.  Conceicao confronted one of the men, Louis Osario-Meléndez, and ordered him to place his hands on the hood of the police car.  Sousa began to question the other man,

Angel Camacho, and noticed that he was wet and breathing hard. Camacho conceded that he had seen the fight but said he was not involved.

Camacho kept his hands in his sweatshirt pockets and Sousa asked him to take them out; Camacho moved his hands out but kept them in front of his waistband where a gun could easily have been tucked. Drawing on his experience as a veteran policeman, Sousa tapped Camacho's waist and felt the butt of a gun. After a struggle with Camacho, the police seized what turned out to be a .40 caliber handgun with an obliterated serial number, loaded magazine and a bullet in the chamber. Camacho's arrest followed.

Camacho moved to suppress the gun as illegally seized. The district judge said that Camacho's seizure was unlawful but that the seizure of the gun was justified by Camacho's intervening crimes of shoving Officer Sousa and resisting arrest, which allowed a search incident to a lawful arrest and seizure of the gun. United States v. Camacho, 608 F. Supp. 2d 178, 185 (1st Cir. 2009). Camacho thereafter pled guilty to being a felon in possession and possessing a gun with an obliterated serial number, reserving his illegal seizure claim for this appeal.

The government on appeal stands by the district court's reasoning that Camacho's intervening actions--his independent crime of assaulting the officer by shoving him away--removed the taint of a supposedly unconstitutional stop and justified the subsequent

-26-

seizure of the gun. The Supreme Court has upheld the admission of evidence seized after an unlawful search based on a series of exceptions and the circuit courts have followed suit.[6] We have a decision directly in point supporting the district judge, United States v. King, 724 F.2d 253 (1st Cir. 1984), which the panel majority is unable to distinguish.

However, the predicate assumption--that the stop of Camacho was unlawful--is also mistaken, because in fact the police had "'a particularized and objective basis' for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). We may affirm the decision below on any grounds supported by the record, see United States v. Mendoza-Acevedo, 950 F.2d 1, 3 (1st Cir. 1991), and the Terry-stop issue is the more important and recurring issue.

Whether or not a gang fight is graded as a major crime, it is potentially a very serious matter. Sometimes such fights are about control of the neighborhood drug trade, stem from persistent violent rivalries or have the potential to create ongoing dangerous

---

[6] Wong Sun v. United States, 371 U.S. 471 (1963) (attenuation); United States v. Paradis, 351 F.3d 21 (1st Cir. 2003)(same); Nix v. Williams, 467 U.S. 431 (1984) (inevitable discovery); United States v. Almeida, 434 F.3d 25 (1st Cir. 2006) (same); Murray v. United States, 487 U.S. 533 (1988) (independent source); United States v. Jadlowe, 628 F.3d 1 (1st Cir. 2010) (same); United States v. Leon, 468 U.S. 897 (1984) (good faith exception); United States v. Belton, 520 F.3d 80 (1st Cir. 2008) (same).

feuds.  Deadly weapons may be used, just like the one carried by Camacho; fighters or passers-by may be injured or killed.  This fight had provoked multiple 911 calls.

The officers in this case had every reason to suspect anyone scattering upon the arrival of the police.  Although the officers did not recognize Camacho and his companion as gang members, in this instance the gang unit had been told at a briefing that the Latin Kings were importing gunmen from out-of-state to retaliate against another gang.  Detaining any such persons was thus especially urgent and, once the participants fled the scene, further investigation was likely to be fruitless.

Wardlow said that presence in a high crime area was not alone enough for reasonable suspicion, 528 U.S. at 124, but the Court then added that presence in such an area was relevant, id., and that such presence coupled with other reasons for suspicion can furnish reasons for the stop.  Id. at 124-25.  The Wardlow Court continued:

> In allowing such detentions, Terry accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent.  The Terry stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further.  If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way. But in this case the officers found respondent

-28-

in possession of a handgun, and arrested him
for violation of an Illinois firearms statute.

Id. at 126.

Directly in point is United States v. Brewer, 561 F.3d 676 (7th Cir. 2009) (Posner, J.). There a police officer investigating a report of a fight at an apartment complex heard gunshots as he approached. A car passed in the opposite direction, the officer had it stopped by a second officer, and the defendant admitted that he had a gun in the car and on his person. The basis for suspicion was thin because other evidence linking the car to the gunfire was unknown to the officers at the time of the stop. Id. at 677-78.

But the unanimous Seventh Circuit panel made clear that not much suspicion was required for a brief investigatory stop, and what was present in Brewer sufficed:

> When we consider the dangerousness of the crime, the brevity of the interval between the firing of the shots and the spotting of the sole vehicle quickly exiting, the minimal intrusion on the occupants of the vehicle, the need of the police to inform themselves of the conditions in the complex before endangering themselves by entering it in the dark, and the further need to stop potentially fleeing suspects until more information about the crime could be obtained, we conclude that the police acted reasonably . . . .

561 F.3d. at 679. One detail aside, which did not involve suspicion at all but rather officer safety, Brewer and the present case are twins.

-29-

Wardlow and Brewer quite properly set a low threshold of suspicion for a "minimal intrusion, simply allowing the officer to briefly investigate further." Wardlow, 528 U.S. at 126. The suspicion may be modest; but the intrusion is similarly modest and the need for prompt inquiry is compelling. Brewer, 561 F.3d at 679. In questioning Camacho, the police acted reasonably. Reasonableness, as it happens, is the standard set by the Fourth Amendment itself.