# United States Court of Appeals
## For the First Circuit

No. 12-1372

UNITED STATES,

Appellee,

v.

CLARVEE GOMEZ, a/k/a Tony,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]
[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Robert E. Toone, with whom Foley Hoag LLP was on brief, for appellant.
Daniel C. Taylor, Attorney, U.S. Department of Justice, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

May 3, 2013

**LYNCH, Chief Judge**.  Clarvee Gomez was convicted by a jury of conspiracy to distribute 500 grams or more of cocaine.  He was sentenced by the court to a ten-year mandatory minimum term of imprisonment under 21 U.S.C. § 841(b)(1)(A)(ii), based on the court's finding that the crime involved eight kilograms of cocaine. He challenges both his conviction and sentence.

Gomez's primary argument as to his conviction is that the denial of his motion to suppress evidence seized from him in Lawrence, Massachusetts when he left the scene of a drug deal was error because probable cause was lacking.  We disagree.  His primary argument as to sentencing is that the ten-year mandatory minimum sentence, triggered by five kilograms or more of cocaine, offends Apprendi v. New Jersey, 530 U.S. 466 (2000), where the jury found his offense involved only 500 grams or more of cocaine and no greater amount was charged in the indictment.  We have already rejected the sentencing argument.[1]  See United States v. Goodine, 326 F.3d 26, 32 (1st Cir. 2003); United States v. Eirby, 262 F.3d 31, 38-39 (1st Cir. 2001).  We affirm.

I.

How we view the facts depends on the claim asserted. Gomez does not claim that, if the indictment encompassed all of the conduct for which there was proof at trial, the evidence did not

---

[1] The viability of this precedent may be called into question by the Supreme Court's upcoming decision in Alleyne v. United States, No. 11-9335 (argued Jan. 14, 2013).

-2-

support his conviction.  He makes the more limited claim that evidence of a particular transaction was outside the scope of the conspiracy charged in the indictment.  That presents a question of evidentiary sufficiency.  See United States v. Perez-Ruiz, 353 F.3d 1, 7 (1st Cir. 2003).  As to the issue of probable cause, we review the court's factual findings supporting a conclusion as to probable cause for clear error and its legal conclusion de novo.  United States v. Camacho, 661 F.3d 718, 723-24 (1st Cir. 2011).

A.        The August-September 2008 Drug Transaction Involving Gomez, a Confidential Informant, and Pena

This case involved both Gomez and his co-defendant Juan Pena-Rosario, and interactions in Orlando, Florida and Lawrence, Massachusetts.  In the summer of 2008, Gomez, who was based in the Boston area, was put in touch with a DEA confidential informant ("CI") located in Orlando, Florida because Gomez wanted to buy large quantities of cocaine suitable for distribution.

On August 6, 2008, the CI recorded his telephone conversation with Gomez.  Gomez said that he knew people in Boston who were "ready to deal with high quantities" of cocaine, that the prices in Boston "are sky high right now," and that his people in Boston "don't mind paying up the money."  Gomez wanted to "talk it over" with the CI to "[s]et the price. . . . a really good price, to pay for everything, the trip and everything."  In other conversations, the CI told Gomez that if he wanted the CI not only to sell him cocaine but also to transport it to Massachusetts,

-3-

Gomez would have to pay extra for transportation at a rate of a thousand dollars per kilogram of cocaine.

Less than a month later, Gomez drove from Massachusetts to Orlando to meet with the CI. The CI met with Gomez on August 28, 2008, and following DEA instructions, wore a body microphone during the meeting. Gomez and the CI discussed the logistics of the CI transporting the cocaine to Massachusetts, and the CI showed Gomez seven kilograms of cocaine (which an undercover DEA agent had brought to the meeting place). Gomez cut into one of the cocaine packages with a knife, rubbed the cocaine on his fingers, tasted it, and declared that it was "good" and "really pure." Gomez then confirmed that "you're bringing me seven, right?" and "[i]t's seven, right?" -- meaning that the CI would bring Gomez seven kilograms of cocaine. The CI agreed. Gomez gave the CI $7000 in cash to pay for transporting the seven kilograms of cocaine to Massachusetts.

Again following DEA instructions, the CI arranged another meeting with Gomez on September 2, 2008 at a Chili's Restaurant in Lowell, Massachusetts, where the CI was to give the seven kilograms of cocaine to Gomez in exchange for money. The CI again wore a body microphone during the meeting.

Agents conducting surveillance of the meeting saw a black BMW X5 SUV pull into the parking lot of the restaurant; they recognized this car as belonging to Juan Pena-Rosario, whom they

had been investigating as a cocaine distributor since 2006. Pena was driving the black SUV. During the meeting, Gomez told the CI that "his guy was outside" the restaurant and at some point left the restaurant to meet him. Agents watching the meeting from outside saw Gomez leave the restaurant and talk to Pena for five minutes. So the agents there knew of a connection between Gomez and Pena.

After returning to the restaurant, Gomez urged the CI to "front him" the seven kilograms of cocaine, meaning give him the cocaine without payment on the understanding that Gomez would pay later. The CI refused to accept this arrangement, and Gomez would not agree to pay for the cocaine up front. The deal did not go through.

B.        The December 2008 Drug Transaction Involving Gomez and Pena-Rosario, and the Ensuing Search of Gomez

Gomez's argument as to the alleged lack of probable cause turns largely on the next transaction by Gomez, in Lawrence, Massachusetts. On September 29, 2008, DEA agents initiated wiretaps on two cell phones being used by Pena, and they continued monitoring his phone calls through December of 2008.

On December 11, 2008, agents intercepted a series of phone calls beginning at 5:55 p.m. between Pena and Individual No. 1. His identity at the time was unknown to agents, but they later

learned it was Gomez.[2]  Individual No. 1 called Pena.  Using language frequently used by drug dealers to refer to drug transactions, Pena and Individual No. 1 set up what agents listening to the call believed to be a drug deal for Individual No. 1 to provide Pena with one kilogram of cocaine that night.  They talked about meeting later that evening and Pena told Individual No. 1 to be ready.

At 6:44 p.m., Pena spoke over the phone with a second unknown individual, Individual No. 2, different from the first individual from whom Pena had arranged to obtain the cocaine.  Pena told Individual No. 2 to "get ready" because "the girl is ready." "Girl" is common code among drug dealers for a kilogram of cocaine, and agents interpreted these conversations to mean that Pena was talking to a customer for the kilogram of cocaine Pena would obtain that evening.

At 7:20 p.m., Individual No. 1 called Pena back and asked him what time they were meeting.  Pena told Individual No. 1 to be on stand-by because he was still waiting to hear back from his customer.

Individual No. 2 called Pena back at 8:32 p.m., telling him to call the supplier and move ahead.  Individual No. 2 asked Pena to obtain the "girl" as soon as possible.  Pena told this

_____

[2] Because the officers did not know before Gomez's arrest that he was the speaker, that later-acquired knowledge is not considered.  See Sibron v. New York, 392 U.S. 40, 63 (1968).

-6-

second individual that "they have it," said he would "get in touch with them," and then said he was "going to go over there to see them," making it likely that he planned to meet with more than one individual.

At 8:51 p.m., Pena spoke with Individual No. 1 over the telephone and asked, "Where are we going to eat?" Agents interpreted this to mean, "Where are we going to consummate the deal?" Individual No. 1 responded, "Do you know where the karate school is, on 620 Essex?" and said "I'm here right now," "on the third floor." Pena agreed to meet there.

At that point, the surveillance team tracking Pena split into two groups, one of which followed Pena's car while the other group went directly to 620 Essex Street in Lawrence, Massachusetts. 620 Essex Street is a four-story brick building where approximately seven businesses are located, including a karate studio on the third floor.

At about 9:10 p.m., agents saw a gray Dodge arrive at 620 Essex Street; a single male whom the agents did not recognize left the Dodge and entered the building. At about 9:15 p.m. -- about twenty minutes after Pena and Individual No. 1 arranged to meet at 620 Essex Street -- agents observed Pena arrive at 620 Essex Street in his black BMW SUV, park it, and meet an individual whom the agents did not recognize in the doorway of the building. Pena entered the building with that individual and walked up the stairs.

About five or six minutes later, agents saw Pena leave the building, get in his car, and drive away. About ten to fifteen minutes after Pena left, agents saw three individuals whom they did not recognize leave 620 Essex Street, get into the Dodge, and drive away. During the approximately thirty minutes that agents watched 620 Essex Street, no one entered or left the building other than Pena and these three individuals.

One team of agents followed Pena and arrested him when he reached his apartment complex. A search of Pena revealed a kilogram of cocaine stuffed into the waistband of his pants, as well as a cell phone whose number matched the number Pena used in the wiretapped phone calls to set up the drug transaction earlier that night.

Another team had followed the Dodge as it left 620 Essex Street. This team stopped the Dodge when it was told cocaine had been found on Pena. Officers pulled the Dodge over, and found Gomez sitting in the rear passenger seat. Each of the three passengers in the vehicle was searched, and the search of Gomez recovered a cell phone, a wallet, and a set of keys. Law enforcement agents later examined the phone and found that its number matched the number of Individual No. 1, whom Pena had spoken

to earlier that night.  Gomez's wallet also contained a business card; written on it was the phone number of the CI from Florida.[3]

## II.

Gomez and Pena were indicted on one count of conspiracy to possess with intent to distribute cocaine under 21 U.S.C. § 846:

> From a date unknown to the Grand Jury, but from at least in or about September, 2008, and continuing thereafter until at least December 11, 2008, in the District of Massachusetts and elsewhere, [the defendants] herein, did knowingly and intentionally combine, conspire, confederate, and agree with each other and other persons unknown to the Grand Jury, to possess with intent to distribute cocaine.

The indictment "alleged that the offense . . . involved at least 500 grams of a mixture and substance containing a detectable amount of cocaine. . . .  Accordingly, Title 21, United States Code, Section 841(b)(1)(B)(ii) applies to this Count."  Pena, but not Gomez, was also charged with possession of cocaine with intent to distribute, and aiding and abetting the same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  On December 8, 2009, Pena pled guilty to both counts.

Gomez did not plead guilty, and he filed a motion to suppress all evidence recovered after the December 11, 2008 search of him, arguing that he was arrested and searched without a warrant

---

[3] Although the government was aware of the prior association of Pena and Gomez from the failed September 2 transaction, that played no role in the probable cause determination.

or probable cause.  The district court denied the motion, explaining that:

> [T]he agents did have sufficient information to give them probable cause to arrest Gomez.  Based on the intercepted coded phone conversations, they reasonably believed that Pena-Rosario planned to meet a group of individuals at 620 Essex Street and purchase cocaine from them.  Gomez was an occupant of a car that arrived at 620 Essex Street shortly before Pena-Rosario arrived and had left shortly after Pena-Rosario had exited the building.  This meeting occurred at approximately 9:15 p.m., a time when one would expect the four-story office building to be empty.  Although these facts did not definitively prove that Gomez was involved in criminal activity, they provided the agents sufficient grounds to believe that Gomez had committed a criminal offense.

Gomez also moved to exclude evidence regarding the meetings between Gomez and the CI in August and September of 2008, on the ground that this evidence was "not relevant to this indictment."  The district court denied Gomez's motion without prejudice to raising the issue again during trial; when raised at trial, the court overruled Gomez's objection and allowed the evidence to be introduced.

Near the end of the five-day jury trial, the government submitted two different jury verdict forms to the court, one of which asked the jury to make findings as to two different drug-quantity thresholds -- either 500 grams or more, or five kilograms or more, of a mixture or substance containing cocaine -- while the other only asked the jury to determine whether the offense involved 500 grams or more of a mixture or substance containing cocaine.  Gomez opposed use of the first verdict form on the ground that

-10-

"[t]he indictment charges 500 grams or more"; the court agreed and used the second form. The jury then found Gomez guilty of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846, and found that "the offense involved at least 500 grams or more of a mixture and substance containing a detectable amount of cocaine."

At Gomez's March 8, 2012 sentencing, the government argued that eight kilograms of cocaine were attributable to Gomez, triggering a mandatory minimum sentence of ten years pursuant to 21 U.S.C. § 841(b)(1)(A)(ii). Gomez argued that because the indictment only charged him with, and the jury only found him responsible for, an offense involving 500 grams or more of cocaine, the appropriate mandatory minimum sentence was only five years pursuant to § 841(b)(1)(B)(ii).

The court found "that the weight is eight kilograms" and imposed "a minimum mandatory sentence of 120 months." Gomez timely appealed the district court's judgment.

III.

On appeal, Gomez alleges two errors in the admission of evidence against him at trial, and two errors at sentencing.

A.      Alleged Errors at Trial

1.      Evidence Regarding the Florida Transaction

Gomez argues that the August-September 2008 phone calls and meetings between Gomez and the CI in Florida and Massachusetts

-11-

were outside the scope of the charged conspiracy, and that introducing evidence concerning these events constituted a prejudicial variance. We review this claim de novo, see United States v. Rivera-Donate, 682 F.3d 120, 128 n.7 (1st Cir. 2012), considering "whether a variance occurred and, if so, whether that variance prejudiced [the defendant's] substantial rights," id. at 128 (quoting Perez-Ruiz, 353 F.3d at 7). To determine whether the government proved that the conduct in question was part of the charged conspiracy, we "apply[] the typical framework for the review of sufficiency challenges in criminal cases." Id. There was no variance here.

The indictment charged that the conspiracy took place "[f]rom a date unknown to the Grand Jury, but from at least in or about September, 2008, and continuing thereafter until at least December 11, 2008, in the District of Massachusetts and elsewhere." This language is broad enough to include not only Gomez's meeting with the CI in Lowell, Massachusetts in September of 2008, but the related events occurring in Florida in August of 2008.

Moreover, there was evidence sufficient for a jury to conclude that the August-September 2008 transaction and the December 2008 transaction were part of the same conspiracy. There was evidence that both transactions: (1) served a common goal, i.e., supplying Pena with cocaine; (2) were mutually interdependent, inasmuch as a jury could have found that the second

-12-

transaction took place because the first transaction, which was meant to supply Pena with cocaine, fell through; and (3) involved overlapping participants, namely Gomez and Pena.  See United States v. Dellosantos, 649 F.3d 109, 117 (1st Cir. 2011).  There was no variance, and no error in the admission of evidence concerning the planned drug deal between Gomez and the CI.

2. The Court's Probable Cause Determination as to the Denial of the Motion to Suppress the Cell Phone and Wallet Seized During the Search After the Karate School Transaction

We review the court's factual findings for clear error and its legal conclusion as to probable cause de novo.  See Camacho, 661 F.3d at 723-24.  We determine whether an arrest was supported by probable cause using a "totality of the circumstances" standard, United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000) (quoting United States v. Torres-Maldonado, 14 F.3d 95, 105 (1st Cir. 1994)), under which "the government bears the burden of establishing that, at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a reasonable person in believing that the individual had committed or was committing a crime," id.

Gomez first argues that the district court clearly erred in finding that "one would expect the four-story office building [at 620 Essex Street] to be empty" at 9:15 p.m., when Pena and the three individuals who later left together in the Dodge were in the building.  We need not resolve this claim.  The parties stipulated

-13-

below that while agents watched 620 Essex Street -- a period of about a half-hour -- no one entered or left the building other than Pena and the three individuals, and together with the court's other unchallenged findings, this is enough to support the court's legal conclusion as to probable cause.

Law enforcement agents had learned from Pena's wiretapped conversations that he was going to meet with his cocaine suppliers at 620 Essex Street on the evening of December 11, 2008. The agents reasonably believed that Pena would purchase a kilogram of cocaine at this meeting based on the code used by Pena and the conversations with Individual No. 1, with whom he arranged the meeting over the phone to get the cocaine, and Individual No. 2, to whom Pena intended to sell the drugs. Agents watched Pena arrive at 620 Essex Street about twenty minutes after the final phone call between Pena and Individual No. 1 and, after staying in the building for only a few minutes, leave. Soon thereafter, and before arresting Gomez, the agents discovered one kilogram of cocaine on Pena. Based on this information, the agents had probable cause to believe that Pena obtained a kilogram of cocaine while at 620 Essex Street.

Agents also learned from the wiretapped conversations that Individual No. 1, with whom Pena arranged the meeting, was already at the "karate school" on the third floor of the building at 620 Essex Street as of 8:51 p.m. Agents set up surveillance at

620 Essex Street immediately thereafter, and saw (1) an unknown man arrive at the building in a gray Dodge Avenger; (2) Pena arrive at the building, meet with an unknown man, walk up the stairs, and then leave the building after a few minutes; and (3) three unknown men leave soon after Pena in the gray Dodge. Whether or not the agents thus had probable cause to believe that the three men that left in the Dodge included the individuals from whom Pena had arranged to buy a kilogram of cocaine, they did have probable cause when, in addition, they arrested Pena and found him with the cocaine.[4]

Gomez's main argument on appeal is that even if there was probable cause to arrest and search Pena, this did not translate into probable cause to arrest Gomez. Gomez says that as far as agents then knew, he was just in the wrong place at the wrong time. After all, agents did not then know that Gomez was the person with whom Pena had arranged the meeting. Gomez quotes Ybarra v. Illinois, 444 U.S. 85, 91 (1979), for the proposition that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable

---

[4] No one else entered or left 620 Essex Street during the half-hour that agents watched the building; two of the men who left in the Dodge were present in the building when agents began surveillance, just as Individual No. 1 said he would be; the three men left in a group, consonant with Pena's statement that he would be meeting more than one person; and the Dodge arrived at the building immediately before Pena's arrival, and left with the three men soon after his departure.

cause to search that person."  But agents did not arrest Gomez based merely on his proximity to other persons suspected of criminal activity; rather, he was arrested based on the strong likelihood that he himself had participated in this activity.

Agents reasonably believed, based on the wiretapped conversations and the search of Pena, that Pena had met with a group of individuals at 620 Essex Street and bought a kilogram of cocaine from them.  They also reasonably believed that the three individuals who left in the Dodge were this group, and Gomez was among these three individuals.  Furthermore, "criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences."  United States v. Martinez-Molina, 64 F.3d 719, 729 (1st Cir. 1995).  The private nature of drug deals involving the purchase of large quantities of cocaine appropriate for distribution only bolstered the already strong likelihood that all three individuals leaving in the Dodge had participated in the drug transaction that had occurred.

The facts of this case are similar to United States v. Sepulveda, 102 F.3d 1313 (1st Cir. 1996), where we upheld a finding of probable cause to arrest and search the defendant where he had been present as his co-defendant sold drugs.  Id. at 1315-16.  The facts here actually support probable cause even more strongly than in Sepulveda, as agents here had specific information that caused

them to reasonably believe that all three individuals leaving in the Dodge had been involved in the selling of cocaine to Pena together. In contrast, the cases that Gomez cites in support of his argument are distinguishable. We list the main cases on which he relies. See, e.g., Sibron v. New York, 392 U.S. 40, 62-63 (1968) (no probable cause where defendant observed talking with known narcotics addicts, but agents had no specific reason to believe criminal activity had occurred or that defendant had participated in that activity); United States v. Valentine, 539 F.3d 88, 93-95 (2nd Cir. 2008) (no probable cause where defendant present and associating with other men at apartment building where controlled buy was to take place, but agents had no reason to believe there were any participants in controlled buy other than intended purchaser); United States v. Collins, 427 F.3d 688, 690-93 (9th Cir. 2005) (no probable cause where defendant arrived in parking lot at time agents expected co-defendant to receive stolen checks, but another individual separately arrived at same time, all individuals remained visible at all times, and defendant did not interact with co-defendant); United States v. Ingrao, 897 F.2d 860, 862-65 (7th Cir. 1990) (no probable cause where defendant, while carrying a black bag, walked between two buildings while a suspected drug transaction occurred out of one of the houses, which belonged to a known drug trafficker, but agents had no reason to believe defendant had been in trafficker's house); United States v.

-17-

Everroad, 704 F.2d 403, 405-07 (8th Cir. 1983) (no probable cause where defendant seen accompanying co-defendant, who had arranged drug deal with undercover officer, but defendant not present during any drug deal or conversation about drugs); United States v. Ceballos, 654 F.2d 177, 179-180, 185-86 (2d Cir. 1981) (no probable cause where defendant seen entering residence of suspected drug dealer and leaving with brown paper bag, but agents had no specific reason to believe criminal activity had occurred while defendant in residence); United States v. Chadwick, 532 F.2d 773, 784-85 (1st Cir. 1976) (no probable cause where defendant met co-defendants at train station and loaded footlocker suspected of containing marijuana into car, but agents had no reason to believe defendant knew contents of footlocker).

The claims of trial error fail.

B.        Alleged Errors at Sentencing

　　　　1.        The Court's Imposition of a Mandatory Minimum Sentence Based on Its Quantity Findings

Gomez argues that his mandatory minimum sentence of ten years was imposed in violation of Apprendi v. New Jersey, 530 U.S. 466, since the mandatory minimum was based on the court's findings as to drug quantity.

Gomez acknowledges that we have rejected this argument before, in United States v. Goodine, 326 F.3d 26, where we held that "drug quantity for purposes of § 841 is a sentencing factor that may be determined by a preponderance of the evidence," so that

"a judge's determination of drug quantity can influence the mandatory minimum sentence imposed." Id. at 32. Gomez notes, however, that our holding in Goodine relied on Harris v. United States, 536 U.S. 545 (2002), and that the Supreme Court recently heard oral argument on whether Harris should be overruled. See Alleyne v. United States, No. 11-9335 (argued Jan. 14, 2013). Gomez urges that we should withhold decision in this appeal until Alleyne is decided. We decline to do so. Under controlling First Circuit and Supreme Court precedent, the district court did not err in sentencing Gomez to a mandatory minimum sentence based on the court's findings as to drug quantity.

In any event, any error was harmless, since the "evidence overwhelmingly establishe[d] the minimum drug quantity needed to justify" Gomez's sentence, here five kilograms of cocaine, where Gomez repeatedly tried to buy seven kilograms for him to resell. United States v. Soto-Beníquez, 356 F.3d 1, 46 (1st Cir. 2004).

2.      Notice as to the Mandatory Minimum Sentence

Finally, Gomez argues that because the indictment against him specified only that 21 U.S.C. § 841(b)(1)(B)(ii) applied to the count against him, the court erred by sentencing him pursuant to § 841(b)(1)(A)(ii), which imposes a ten-year mandatory minimum for offenses involving five kilograms or more of cocaine.

We have examined this exact issue before, in United States v. Eirby, 262 F.3d 31, and there explained that since "[t]he

-19-

specification of a penalty provision for the underlying offense [is] . . . not essential to the validity of the conspiracy count," a "court's use of section 841(b)(1)(A) rather than section 841(b)(1)(B) . . . [does] not usurp the prerogative of the grand jury." Id. at 38. We also explained in Eirby that "the switch to section 841(b)(1)(A) [does] not constitute reversible error unless it deprived the appellant of notice or otherwise misled him to his detriment." Id. At least as of the time the district court denied Gomez's motion to exclude evidence pertaining to the August-September 2008 transaction, Gomez was put on ample notice that he would be held responsible for the drug quantities involved in both that transaction and the December 2008 transaction if convicted. The court did not err in sentencing Gomez pursuant to a statutory provision not specified in the indictment.

IV.

Gomez's conviction and sentence are affirmed.