PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

No. 11-4032

TRAVIS GAINES,

*Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:10-cr-00398-RDB-1)

Argued: December 7, 2011

Decided: January 27, 2012

Before NIEMEYER, AGEE, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the majority opinion, in which Judge Wynn joined. Judge Niemeyer wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellant. Sapna Mirchandani, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Jonathan Biran, Appellate

Chief, Ayn B. Ducao, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellant. James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellee.

## OPINION

AGEE, Circuit Judge:

The Government appeals from the district court's order granting Travis Gaines' motion to suppress a firearm seized by police following an unlawful stop of a vehicle in which he was a passenger. The district court suppressed the gun on the basis that it was "fruit of the poisonous tree," while the Government maintains that intervening events, *i.e.*, acts of assault and resisting arrest committed by Gaines, purged the illegality of the stop and rendered the firearm admissible. For the following reasons, we affirm the district court's order granting the motion to suppress.

I.

On the afternoon of January 26, 2010, Baltimore City police officers Jimmy Shetterly, Frank Schneider, and Manuel Moro were in a marked police vehicle on patrol in the vicinity of Mosher Street and Pennsylvania Avenue, in Baltimore. The officers observed a white Ford Crown Victoria approaching Mosher Street on Pennsylvania Avenue from the opposite direction. Officer Moro, who was seated in the rear compartment of the police vehicle, later testified that as the Crown Victoria neared the Mosher Street intersection, he observed (from the other side of the intersection) a crack in the Crown Victoria's windshield and informed the other officers.

Officers Schneider and Shetterly testified that after the Crown Victoria turned right onto Mosher Street, they fol-

lowed in the police vehicle and also observed the crack in the windshield. The police activated their vehicle's emergency lights and pulled over the Crown Victoria. In the course of the ensuing vehicle stop, Officer Shetterly observed Gaines (who was a passenger in the rear of the Crown Victoria) moving around in his seat and trying to climb over the front seats, despite commands to stop. Officer Shetterly then ordered Gaines to exit the vehicle and immediately began to pat him down.

As Officer Shetterly began to pat down Gaines in the area of Gaines' waistband, the officer testified that "[a]s I was reaching with my right hand, I could feel the trigger guard and the handle of a firearm. At that time, I yelled 'gun' very loudly to alert the officers of the other present danger." (J.A. 39.) Gaines then assaulted Shetterly, striking him in the face with his elbow. As Gaines turned to flee, Officer Shetterly clearly observed a silver firearm with a black handle in Gaines' waistband. Gaines then punched Officer Schneider before he was subdued by the officers.

Officers Schneider and Shetterly pushed Gaines into the open trunk of the Crown Victoria as he continued to struggle. When the officers were eventually able to handcuff Gaines and pull him from the trunk, Officer Shetterly observed the firearm fall from Gaines' waistband into the trunk. The police placed Gaines under arrest and seized the firearm, a .380 semi-automatic pistol.[1]

A federal grand jury in United States District Court for The District of Maryland indicted Gaines on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Prior to trial, Gaines moved to suppress the firearm on the grounds that the stop and subsequent search of his person violated the Fourth Amendment.

---

[1]In addition to the charges that form the basis for this appeal, Gaines was prosecuted in state court in Maryland for second degree assault of the police officers.

At a hearing on the motion to suppress, the district court heard testimony from Officers Shetterly, Schneider, and Moro who testified as to their observation of the cracked windshield and the traffic stop. Officer Shetterly testified that after he observed Gaines making furtive movements in the back seat of the Crown Victoria, he ordered Gaines out of the car and conducted a pat down. He testified that as he reached the waistband he "could feel the trigger guard and the handle of a firearm," and "yelled 'gun.'" (J.A. 39.)

After extensive argument by both parties, the district court granted Gaines' motion to suppress. The court initially concluded that the traffic stop was not supported by reasonable suspicion and was accordingly unlawful. The court found "as a factual matter that the officers could not have seen the very slight crack in the lower right portion of the Crown Victoria's windshield." (J.A. 279.) Important to the court's decision was its belief that Officer Moro could not see the crack from the rear seat of the police vehicle, past the two officers in the front seat, across an intersection, through the tinted rear window of the Crown Victoria as the Crown Victoria turned right, away from the officer. For the same reasons, the court declined to credit the testimony of Officers Shetterly and Schneider that they also saw the crack in the Crown Victoria's windshield. Thus, the court determined, the Government failed to establish that the traffic stop was based on reasonable and articulable suspicion of unlawful conduct. On appeal, the Government concedes the traffic stop and consequent pat down of Gaines were unlawful.

The district court then held that Gaines' assault of Officers Shetterly and Schneider did not purge the taint of the unlawful stop in a manner sufficient to allow the gun to be admitted into evidence against Gaines. Critical to the court's analysis was the "clear and undisputed" sequence of events that led to the seizure of the firearm: Gaines was ordered out of the vehicle and patted down, the gun was discovered, and only then

did Gaines attack the officers.[2] (J.A. 282.) The court found dispositive the fact that the firearm was discovered by Officer Shetterly as a direct result of the illegal stop, and not as a result of Gaines' subsequent illegal behavior assaulting the officers. The district court accordingly granted Gaines' motion to suppress.

The Government moved for reconsideration, which the district court denied. The Government noted a timely interlocutory appeal of the district court's orders granting the motion to suppress and denying reconsideration. We have jurisdiction over this appeal pursuant to 18 U.S.C. § 3731 para. 2 (extending jurisdiction to the courts of appeals over interlocutory appeals filed by the United States "from a decision or order of a district court suppressing or excluding evidence").[3]

## II.

On appeal, the Government argues that the taint of the unlawful stop was purged when Gaines assaulted Officers Shetterly and Schneider. Because the Government does not challenge the district court's conclusion that the initial stop and patdown was unlawful, we assume that it was. Nevertheless, the Government, relying heavily on *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997), claims that the firearm is admissible notwithstanding the illegality of the traffic stop.

---

[2]The Government admitted to this course of events during the hearing on Gaines' motion to suppress.

> THE COURT: . . . But here it's undisputed that Officer Shetterly found the gun and yelled 'gun' before the defendant, Mr. Gaines, did anything.

> [AUSA]: Yes. I agree, Your Honor.

(J.A. 248.)

[3]Pursuant to § 3731 para. 2, the Government has certified that this "appeal is not taken for the purpose of delay and that the [suppressed] evidence is a substantial proof of a fact material in the proceeding." (J.A. 315.)

The thrust of the Government's argument is that the assault broke the chain of causation resulting from the illegal stop. As a result, the Government contends that because the firearm had not been physically seized when the assault took place, it could later be lawfully seized pursuant to a valid arrest for the assault upon the police officers and introduced as evidence against Gaines on the firearm charge.

### A.

On appeal of the district court's grant of a motion to suppress, we review the court's findings of fact for clear error and its legal conclusions de novo. *United States v. Jones*, 356 F.3d 529, 533 (4th Cir. 2004).

### B.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend IV. When evidence is discovered as a result of a Fourth Amendment violation, it is, generally speaking, subject to suppression under the exclusionary rule. *United States v. Andrews*, 577 F.3d 231, 235 (4th Cir. 2009). Not all evidence discovered as a result of a Fourth Amendment violation, though, is "fruit of the poisonous tree" and necessarily inadmissible at trial. Evidence derived from an illegal search may be admissible depending upon "whether, granting establishment of the primary illegality the evidence to which the instant objection is made has been come at by exploitation of that illegality, or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (quotation marks and citation omitted).

Thus, where there is sufficient attenuation between the unlawful search and the acquisition of evidence, the "taint" of that unlawful search is purged. To determine whether the derivative evidence has been purged of the taint of the unlaw-

ful search, we consider several factors, including: (1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). The question presented in this case is whether Gaines' commission of a crime *after* discovery of the gun by police, but *before* its seizure, is an intervening circumstance sufficient to purge the taint of the admitted illegal search. Under the facts of this case, we conclude that it is not such an intervening circumstance.[4]

In *Sprinkle*, cited extensively by the parties, we analyzed similar (but not identical) facts and articulated what we described as "an exception to the exclusionary rule of 'fruit of the poisonous tree' doctrine." 106 F.3d at 619. In that case, police conducted an unlawful stop of a car in which Sprinkle was a passenger. *Id.* at 616. Sprinkle stepped out of the car, and officers began to conduct a pat down of his person. *Id.* Before any evidence was discovered in the pat down, Sprinkle pushed the officer away and took flight. *Id.* After running a short distance, Sprinkle pulled a handgun from his pants, continued to run, and eventually fired a shot at the pursuing officer. *Id.* Shortly thereafter, he was apprehended and the gun was seized. *Id.*

Facing charges for being a felon in possession of a firearm, Sprinkle sought suppression of the weapon. The district court granted Sprinkle's motion to suppress the firearm, and the Government appealed. We reversed the district court, holding

---

[4]Because we conclude there is no intervening circumstance, it is unnecessary to evaluate the other *Brown* factors. Were we to do so, however, it is clear that the very short time between the unlawful search and the discovery of the evidence does not tend to dissipate the taint. Moreover, while the district court made no findings regarding the purpose and flagrancy of the official misconduct, we see nothing in the record tending to show that the officers' conduct militates in favor of attenuation of the taint.

that "[i]f a suspect's response to an illegal stop is itself a new, distinct crime, then the police constitutionally may arrest the suspect for that crime." *Id.* at 619 (internal quotation marks, citation, and alteration omitted). In finding the exclusionary rule inapplicable, we explained that "[b]ecause the arrest for the new, distinct crime is lawful, evidence seized in a search incident to that lawful arrest is admissible." *Id.*

In *Sprinkle*, we recognized the "strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest." *Id.* "[A] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Id.* (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)).

The Government argues in this case that, pursuant to *Sprinkle*, Gaines' own illegal actions purged the taint of the unlawful traffic stop. Gaines, on the other hand, emphasizes the Government's repeated concession in the district court that the firearm was discovered by the officers *before* any unlawful activity was committed by Gaines. Accordingly, in Gaines' view, the discovery of the gun cannot be attenuated from the unlawful stop.

We agree with Gaines that a proper reading of *Sprinkle* does not support the Government's position. In that case, the contested evidence (the firearm) was only discovered after the defendant engaged in illegal activity subsequent to an earlier unlawful stop. *See id.* at 619 ("[w]hen Sprinkle drew and fired his gun at the officer, he committed a new crime that was distinct from any crime he might have been suspected of at the time of the initial stop."). The illegal act in *Sprinkle* broke the causal chain between the unlawful stop and the discovery of the firearm. By contrast, in this case, the causal chain remains intact. Gaines' subsequent criminal conduct cannot constitute

an intervening event because it took place *after* the discovery of the firearm.

The Government, however, places much emphasis on our statement in *Sprinkle* that "[b]ecause the arrest for the new, distinct crime is lawful, evidence seized in a search incident to that lawful arrest is admissible." *Id.* at 619. Because the firearm was not physically seized until after Gaines struck the officers, the Government argues, it may be admitted as properly seized pursuant to a lawful arrest.

This argument, though, fails to account for the fact that the gun was discovered prior to Gaines' acts of assault. Although the Government would have us hold that the seizure of the firearm, rather than its discovery by police, is the critical act for assessing whether an intervening event has taken place, that position lacks support in law. In fact, other than the aforementioned language in *Sprinkle*, the Government has not cited any case for the proposition that the seizure of the evidence is legally more significant than the discovery of the evidence when the two acts do not coincide.

Rather, the language found in the caselaw seems to support Gaines' position that, for purposes of the attenuation doctrine, the discovery of the evidence is the relevant event. *See, e.g.*, *Wong Sun*, 371 U.S. at 487 (describing an exception to the exclusionary rule where "the connection between the lawless conduct of the police and the *discovery* of the challenged evidence has become so attenuated as to dissipate the taint") (emphasis added) (internal quotation marks and citation omitted); *United States v. Clark*, 891 F.2d 501, 505 (4th Cir. 1989) ("evidence challenged on a suppression motion will not be excluded unless a causal relationship exists between that particular [Fourth Amendment] violation and the *discovery* of the evidence sought to be excluded") (emphasis added) (citing *Wong Sun*, 371 U.S. at 487); *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003) ("The type of intervening events that serve to attenuate [police] misconduct are those that sever the

causal connection between the illegal arrest and the *discovery* of the evidence.") (emphasis added).

The Supreme Court has recognized the increased privacy interest attaching to protection from unlawful searches as compared to unlawful seizures.

> A seizure affects only the person's possessory interests; a search affects a person's privacy interests. Recognizing the generally less intrusive nature of a seizure, the Court has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible.

*Segura v. United States*, 468 U.S. 796, 806 (1984) (internal citations omitted).

Accordingly, we have little difficulty concluding that where, as here, the discovery of the challenged evidence follows an unlawful search, but precedes an independent criminal act on the part of the defendant, that criminal act is not an intervening event for the purpose of determining whether the "taint" of the unlawful police action is purged.

Finally, we note that our holding finds support in two recently decided cases from other courts of appeals. In *United States v. Camacho*, 661 F.3d 718 (1st Cir. 2011), the First Circuit found suppression was warranted in a factual situation similar to that presented here. In that case, police officers unlawfully detained Camacho as one officer "tapped" Camacho's waist with an open hand, felt a gun, and yelled "gun." *Id.* at 722. A brief struggle ensued, after which Camacho was arrested and the gun seized by police. *Id.* The First Circuit concluded that Camacho's struggle with police did not attenuate the taint caused by his illegal seizure. The court noted that, despite the fact that the gun was seized after a lawful search

incident to Camacho's arrest, "[t]he gun at issue here was not discovered in [such a search]. . . . Officer Sousa conducted the frisk-the search that first discovered the gun-*before* Camacho shoved him and *before* Camacho was arrested." *Id.* at 730 (emphasis in original). Thus, the court was able to conclude that "Camacho's 'intervening' crimes were not, in fact, intervening and thus could not purge the taint of the prior illegal stop." *Id.* at 731.

Similarly, in *United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011), the Sixth Circuit held that evidence that was discovered during an unlawful search was subject to suppression, notwithstanding the fact that the defendant then attempted to flee and was arrested before the evidence was actually seized. There, officers conducted a *Terry*[5] stop of a defendant that the court of appeals later determined lacked reasonable suspicion and was thus unlawful. 659 F.3d at 571. The police searched Beauchamp and discovered $1300 in cash and a plastic baggie containing narcotics before Beauchamp began to struggle and attempt to flee. *Id.* at 574.

In reversing the district court's denial of Beauchamp's motion to suppress, the Sixth Circuit found dispositive the fact that the police discovered the evidence before the subsequent illegal action (the attempted flight). *Id.* The court concluded that "Beauchamp's brief struggle cannot serve as an intervening circumstance because it does not come between the illegal seizure [of Beauchamp] and the discovery of the evidence; there is no break in the chain." *Id.*

Just as in *Camacho* and *Beauchamp*, there was no intervening circumstance in this case to sever the causal connection between the unlawful search and the discovery of the evidence. Police discovered the firearm on Gaines' person before his commission of another crime. Consistent with those cases, and with *Sprinkle*, we hold that Gaines' act of assault did not

---

[5]*Terry v. Ohio*, 392 U.S. 1 (1968).

purge the taint of the unlawful stop, and the district court properly granted the motion to suppress.

### III.

For the aforementioned reasons, we affirm the order of the district court granting Gaines' motion to suppress.

*AFFIRMED*

NIEMEYER, Circuit Judge, dissenting:

After police illegally stopped a Ford Crown Victoria, in which Travis Gaines was a passenger, one officer patted Gaines down for safety concerns. When the officer felt what he believed was a gun, he yelled to his fellow officers, "gun." At that point, Gaines assaulted the officers in an effort to flee, elbowing one in the face and slugging another. After the officers arrested Gaines, pushing his torso into the open trunk of the vehicle, the gun fell from Gaines' waistband onto the floor of the trunk, and the officers seized it as evidence in this case.

The majority orders that the gun be suppressed because the officers "discovered" the gun before Gaines committed his independent criminal act of assault, and, therefore the assault did not purge the taint of the unlawful stop. As the majority states, "We have little difficulty concluding that where, as here, *the discovery* of the challenged evidence follows an unlawful search, but precedes an independent criminal act on the part of the defendant, that criminal act is not an intervening event for purposes of determining whether the 'taint of the unlawful police action is purged.'" (Emphasis added). The majority emphasizes that the discovery of the gun and the simple sequence of events determines the issue. This analysis, however, fails to apply the relevant test for determining whether the tainted discovery of the gun tainted the gun's later seizure.

I submit that the discovery of the gun in this case is an irrelevant fact. The only relevant question is whether knowledge of the existence of the gun gained by its discovery was "*exploited*" to enable the officers to seize the gun after the assault. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (explaining that the taint of illegal officer conduct applies to seizure only if the seizure *exploited* the illegal conduct).

In the record of this case, there is absolutely no evidence that the "discovery" of the gun was exploited to seize it. Even though the "discovery" of the gun was "tainted" as part of the illegal stop, that fact was inconsequential to the gun's later seizure. The gun fell out of Gaines' waistband onto the floor of the car's trunk while officers were lawfully arresting Gaines for assault, and the officers simply picked the gun up after they completed the lawful arrest. The officers did not use the information of the gun's presence either to arrest Gaines or to seize the gun. Rather, while arresting Gaines for assaulting police officers, the gun fell out of his waistband *on its own accord* while officers were handcuffing him, and, when officers saw it on the floor of the car's trunk, they picked it up and retained it as evidence to prosecute Gaines with a violation of 18 U.S.C. § 922(g)(1).

I would conclude that the gun should not be suppressed and that the government should be allowed to use the gun as evidence in its prosecution of Gaines for violation of § 922(g)(1). I would accordingly reverse the district court's suppression order.

I

In the early afternoon of January 26, 2010, three Baltimore police officers pulled over a Ford Crown Victoria based on their observations of a cracked windshield. In the Crown Victoria were three individuals, two women in the front seats and Gaines in the back seat. As the officers approached the vehi-

cle, Officer Shetterly observed Gaines rising up out of his seat, "reaching in between the two seats," and making a "shoving motion in his front waistband area." While the other officers were conferring with the driver to examine her license and vehicle registration and to obtain permission to search the vehicle, Officer Shetterly ordered Gaines to exit the vehicle. As Gaines exited, he placed his hand on the front of his waistband, a movement that Officer Shetterly found was consistent with a "gun check" by an armed individual. For safety concerns, Shetterly patted Gaines down and felt the trigger guard and butt of what he thought was a gun. When he yelled "gun" to alert his fellow officers, Gaines hit Officer Shetterly in the face with his elbow, forcing the officer to step backwards. As Gaines attempted to flee, moving in the direction of Officer Schneider, he started reaching to his waistband and, at the same time, punched Officer Schneider in the face. At that point, Officer Shetterly observed what he suspected was a silver gun with a black handle. Officers Shetterly and Schneider then wrestled Gaines into the trunk of the vehicle, which the driver had opened, and held his right arm to prevent him from pulling out the gun with his right hand. As the officers completed handcuffing Gaines and removed him from the trunk, the gun fell out of Gaines' waistband and onto the floor of the trunk. The officers then seized the gun and held it as evidence.

Gaines was charged with violating 18 U.S.C. § 922(g)(1) (prohibiting a felon from possessing a firearm), and, during a hearing on Gaines' motion to suppress the gun, all three officers testified that they had seen the crack in the windshield of the Crown Victoria, which had formed the basis of the traffic stop. After the district court observed photographs of the crack, it rejected the officers' testimony that the crack could have been seen, and it found, "as a factual matter, that the officers could not have seen the very slight crack in the lower right portion of the Crown Victoria's windshield." Accordingly, it concluded that the traffic stop was not supported by reasonable suspicion and therefore was unconstitutional. The

court also found, however, that Gaines' suspicious actions in the vehicle and when exiting the vehicle justified Officer Shetterly's pat down of Gaines. Ultimately, the court ordered that the gun be suppressed because it was "discovered as a direct result of the illegal traffic stop," and rejected the government's argument that Gaines' lawful arrest for assaulting the police officers purged the taint of the illegal stop so that the gun was legally seized as part of a lawful arrest.

From the district court's order suppressing the gun, the government appealed.

## II

The applicable jurisprudence is well established. The Fourth Amendment protects citizens against "unreasonable searches and seizures," and the judicially created exclusionary rule is a "supplement" that serves to enforce those Fourth Amendment protections. *Davis v. United States*, 131 S. Ct. 2419, 2423 (2011). The exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence *obtained* by way of a Fourth Amendment violation." *Id.* (emphasis added). But the rule "applies only where it results in appreciable deterrence," and the Supreme Court "ha[s] never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." *Herring v. United States*, 555 U.S. 135, 141 (2009) (internal quotation marks omitted). "The principal cost of applying the [exclusionary] rule is, of course, letting guilty and possible dangerous defendants go free—something that 'offends basic concepts of the criminal justice system,'" *id.* (quoting *United States v. Leon*, 468 U.S. 897, 908 (1984)), and the application of the rule is only proper "where its deterrence benefits outweigh its substantial social costs," *Hudson v. Michigan*, 547 U.S. 586, 594 (2006) (quoting *Penn. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998)) (internal quotation marks omitted).

To be subject to the exclusionary rule, evidence need not be obtained only during the course of the Fourth Amendment violation. *Wong Sun*, 371 U.S. at 487-88. In *Wong Sun*, the Supreme Court held that evidence that is the "fruit" of an unconstitutional search or seizure must also be suppressed. *Id.* at 484. Allowing the introduction of evidence indirectly acquired as a result of illegal police conduct would undermine the deterrence of the exclusionary rule entirely by giving officers an incentive to stop and search citizens illegally. *See Brown v. Illinois*, 422 U.S. 590, 602 (1975).

The inquiry into what evidence constitutes "fruit" of illegal conduct and must therefore be suppressed is not a simple but-for causation determination. The Court in *Wong Sun* set forth the proper standard:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at *by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint*.

*Id.* at 487-88 (emphasis added); *see also Brown*, 422 U.S. at 601-05; *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002) (recognizing that whether a confession was obtained by the exploitation of an illegal arrest is to be determined by the application of several factors, including "the presence of intervening circumstances"). Thus, the governing test for determining whether illegal conduct by police officers taints a seizure of evidence following an intervening lawful arrest is whether the police "exploited" the illegal conduct in order to obtain the evidence. *See Brown*, 422 U.S. at 603.

We applied these principles in *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997), a case factually similar to that

before us, which, I submit, governs the disposition of this case. In *Sprinkle*, as in this case, the court determined that the officers' original stop and seizure of the defendant had been unlawful. *Id.* at 617-19. After the illegal stop, as an officer began to pat the defendant down, the defendant pushed the officer away and fled, pulling out a handgun and firing shots at the pursuing officer as he did so. *Id.* at 616. The officer arrested the defendant and seized the firearm, which was in plain view at the time, and the defendant was charged with violation of 18 U.S.C. § 922(g)(1). In rejecting the defendant's challenge to the admissibility of the seized gun as the fruit of an illegal stop, we stated:

> If a suspect's response to an illegal stop is itself a new distinct crime, then the police constitutionally may arrest the suspect for that crime. There is a strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest. . . . [A] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct. *Because the arrest for the new, distinct crime is lawful, evidence seized in a search incident to that lawful arrest is admissible.*

*Sprinkle*, 106 F.3d at 619 (emphasis added) (internal quotation marks and citations omitted).

As in *Sprinkle*, Gaines' "response" to the pat down in this case was to commit the "new and distinct crime" of assault. *See Barnhard v. State*, 587 A.2d 561, 565 (Md. Ct. Spec. App. 1991) (no right to resist an unlawful *Terry* stop), *aff'd*, 602 A.2d 701 (Md. 1992). Even though the assault was "triggered by" the illegal stop, the assault itself was a "sufficient intervening event to provide independent grounds for arrest." Thus, in the language of *Sprinkle*, "Because the arrest for the

new, distinct crime [of assault] is lawful, evidence seized in a search incident to that lawful arrest is admissible." 106 F.3d at 619.

The majority declines to apply *Sprinkle*, concluding that because, unlike in *Sprinkle*, the gun in this case was "discovered" *before* Gaines assaulted the officers, the gun's subsequent seizure in connection with the lawful arrest was somehow tainted. The majority fails, however, to explain why "discovery" of the gun before the assault has any constitutional relevance. The proper and only inquiry must be whether the officers obtained the gun from Gaines by "*exploitation of the illegal conduct*." Had the majority conducted this analysis, it would have no reason to reject the application of *Sprinkle*.

The officers in this case obtained the gun that formed the basis of Gaines' § 922(g)(1) charge as a result of his lawful arrest, as the gun fell out of Gaines' waistband after he had been handcuffed for assaulting the officer. The officers simply picked the gun up after it fell from Gaines' waistband. There is absolutely no indication in the record that the arrest or the subsequent seizure of the gun was in any way the result of the government's *discovery* of the gun, much less an "exploitation" of its discovery before the assault. Indeed, the government would not need to introduce any evidence of the original "discovery" of the gun or their prior knowledge of the gun in proving the illegal possession crime.

In furtherance of its holding that evidence of the gun's discovery is relevant, the majority pieces together fragments of language from three other cases that use the word "discovery." *See ante*, at 9-10. But each of those cases dealt with the suppression of a confession, for which the "discovery" and the "seizure" of the evidence were indistinguishable. Moreover, a closer look at the cases reveals that they provide no support for the majority's conclusion that an officer's discovery of a gun before an intervening crime and subsequent lawful arrest renders all action after the arrest tainted. Indeed, in selecting

its quotes from these cases, the majority ignores language from them, as well as other similar cases, stating the proper rule that the police cannot use evidence that they *obtain by the exploitation* of unconstitutional conduct. *See Brown*, 422 U.S. at 603 (inquiring "whether the confession [wa]s *obtained by exploitation* of an illegal arrest" (emphasis added)); *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998) ("If the government has committed a constitutional violation, however, evidence *obtained as a result of the violation* cannot be used unless the connection between the unlawful conduct and the acquisition of the evidence has become so attenuated as to dissipate the taint" (emphasis added) (internal quotation marks omitted)); *United States v. Clark*, 891 F.2d 501, 505 (4th Cir. 1989) ("[T]he evidence *gained as a result of* [a Fourth Amendment] intrusion may . . . be ruled inadmissible" (emphasis added)); *id.* ("Exclusion depends, in part, on whether the evidence was *obtained as a result of that violation*" (emphasis added)); *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003) ("A confession *obtained* . . . must be excluded from evidence" (emphasis added)).

The proper analysis, as mandated by the relevant Fourth Amendment principles, is straightforward. The officers here stopped the Crown Victoria and seized Gaines illegally inasmuch as they stopped the vehicle without reasonable suspicion. Nonetheless, as the district court found, Officer Shetterly was justified in frisking Gaines after the stop because of Gaines' suspicious movements in the car and the need to protect himself and his fellow officers. During the course of Officer Shetterly's pat down of Gaines, the officer discovered the presence of a gun in Gaines' waistband and, because it was discovered during the course of an illegal stop, this discovery was tainted as the fruit of the illegal stop. Had Gaines been arrested at that point, before he committed the assaults on the officers, the evidence regarding the gun would obviously have to be excluded as the product of the illegal traffic stop. Similarly, if Gaines had *successfully* fled after Officer Shetterly felt the gun and the officers thereafter

obtained a search warrant *based upon the tainted discovery of the gun*, the results of that search warrant would be excluded as the fruits of the illegal stop. But the assaults on Officers Shetterly and Schneider were new, voluntary criminal acts by Gaines that authorized the officers lawfully to arrest Gaines for the new, intervening conduct. In connection with the arrest and, *without any exploitation* of the information about the gun's existence gained from the tainted pat down, the gun fell from Gaines' waistband into plain view. At that point, the officers seized the gun in connection with the lawful arrest, and therefore it can lawfully be offered at trial.

### III

The majority's holding also loses sight of the deterrence principles applicable to the exclusionary rule. "The 'sole purpose' of the exclusionary rule 'is to deter future Fourth Amendment violations.'" *United States v. Edwards*, ___ F.3d ___, 2011 WL 6825360, at \*7 (4th Cir. Dec. 29, 2011) (quoting *Davis*, 131 S. Ct. at 2426). The requirement for finding an exploitation of the illegal conduct originates in the rationale for the exclusionary rule itself. The very purpose of determining when the causal chain between police illegality and the eventual seizure of evidence has been broken "is to mark the point of diminishing returns of the deterrence principle inherent in the exclusionary rule." *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999). The exclusion of tainted evidence reduces the incentive for officers to violate the Fourth Amendment, but officers have little incentive to stop people hoping they will commit a new crime so as to justify a subsequent arrest and search. As one court has recognized, "Police do not detain people hoping that they will commit new crimes in their presence; that is not a promising investigative technique, when illegal detention exposes the police to awards of damages." *United States v. Pryor*, 32 F.3d 1192, 1196 (7th Cir. 1994). Thus, "it is critical that courts wrestling with 'fruit of the poisonous tree' issues keep that fundamental [deterrence] notion in mind, for when it is lost sight of the results

can be most unfortunate." *Ienco*, 182 F.3d at 526 (internal quotation marks omitted) (brackets in original omitted). Yet, that is precisely what has happened here—the majority has lost sight of the purposes for which the exclusionary rule extends to fruits of illegal police conduct and thus reached an unfortunate result.

Moreover, the rule announced by the majority today will lead to absurd results. If an officer sees or, in the majority's language, "discovers" a bag of white powder on the front seat of a car during an illegal *Terry* stop, that powder could never be introduced at a trial for possession, no matter what intervening acts occurred, because, under the majority's reasoning, the "discovery" is complete and there can be no intervening circumstances. *See ante*, at 7 & n.4. In a similar vein, under the rule announced today, if the officer in *Sprinkle* had touched the gun prior to the defendant's fleeing and shooting at the officer, the defendant could not have been charged with possession of a firearm. Why such a touch would be constitutionally significant in light of the principles behind the exclusionary rule is never explained by the majority.

To be sure, in this case Officer Shetterly's discovery of the gun in Gaines' waistband was the fruit of the illegal *Terry* stop, and under the governing principles, that discovery could not be *exploited* by the officers to obtain evidence to use against Gaines at trial. But the facts of this case demonstrate that no such exploitation occurred. Gaines attacked two police officers, tried to pull a gun out of his waistband to attack them further, and struggled to resist the lawful arrest. As part of that struggle, the gun that he was reaching for fell out of his waistband onto the floor of the vehicle trunk, in plain view of the officers. Only at that point did the officers seize the gun, and in doing so, they did not rely on their previous knowledge of the gun gained by the tainted pat down, when the existence of the gun was "discovered."

Allowing Gaines to benefit from this new rule suppressing the gun imposes "substantial social costs," while offering no

additional deterrence to police officers. *See Hudson*, 547 U.S. at 591. Further, the majority's new extension of the exclusionary rule to all evidence physically discovered after an illegal stop, without regard to any intervening events that may provide independent grounds for the actual seizure of the evidence, creates minimal, if any, additional deterrence for officers contemplating an illegal *Terry* stop. Such a holding fails to accommodate the Supreme Court's clear guidance that "[s]uppression of evidence . . . has always been our last resort, not our first impulse." *Hudson*, 547 U.S. at 591.

In short, the only unconstitutional conduct at issue in this case is the officers' illegal *Terry* stop, and the majority has failed to prove any nexus, other than but-for causation, between that conduct and the ultimate seizure of the gun. After Gaines assaulted the police officers, the officers lawfully arrested him, and in connection with that arrest, they seized the firearm that fell from Gaines' waistband. Gaines should now be tried for violating § 922(g)(1).

Accordingly, I respectfully dissent from the majority's decision effectively letting Gaines go free.